## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

IN RE:      **RICHARD PAUL GLUNK**        :        **Chapter 7**
                                          :
                        **Debtor**        :        **Bky. No. 05-31656ELF**

# O P I N I O N

BY: **ERIC L. FRANK, United States Bankruptcy Judge**

## I. **INTRODUCTION**

In the course of administering a bankruptcy docket, a bankruptcy judge is obliged, from time to time, to decide whether a debtor is seeking to abuse the spirit of the Bankruptcy Code and is acting in bad faith. If such a finding is made, a court will deny the debtor access to the rehabilitative provisions of the Code and will dismiss the debtor's bankruptcy case. As one court has observed, an issue of this type

> unavoidably involves the bankruptcy court in difficult value judgments. It's an unpleasant job, but someone has to do it. . . . [T]hat . . . "someone" is the bankruptcy judge.

In re Rogers, 65 B.R. 1018, 1021 (Bankr. E.D. Mich. 1986).

In this case, a physician, who previously enjoyed a very high annual income, and who retains an ownership interest in substantial, exempt assets, is seeking a bankruptcy discharge under chapter 7. He is the defendant in prepetition state court litigation in which he is being sued for millions of dollars in damages based upon a cosmetic surgical procedure he performed that went awry and resulted in the death of an 18 year old woman. The parents of the decedent allege that the Debtor's professional conduct was not merely negligent; they allege that he committed fraud and that his conduct was willful and malicious. They assert that he filed his chapter 7

-1-

bankruptcy case in bad faith.  If this case is not dismissed, the parents ask that I grant them relief

from the automatic stay so that they may litigate their claims against the Debtor in state court.

I address these issues below in some detail.  This opinion constitutes my attempt to make

a decision, as far as is possible, based on objective principles rather than subjective, personal

beliefs, and to identify the policies and considerations that guide my decision.

## II. <u>PROCEDURAL HISTORY</u>

On August 31, 2001, Daniel H. Fledderman ("Mr. Fledderman") and Colleen M.

Fledderman ("Mrs. Fledderman) (collectively, "Mr. and Mrs. Fledderman") in their capacities as

co-administrators of the Estate of Amy Fledderman ("the AF Estate") and Mrs.  Fledderman in

her own right filed a Complaint ("the CP Complaint") against the Debtor and various other

Defendants in the Court of Common Pleas, Philadelphia County, Pennsylvania, docketed as No.

3619, August Term 2001 ("the CP Action").  On August 31, 2005, the Debtor filed a voluntary

petition under chapter 7 of the Bankruptcy Code in this court.

On December 19, 2005, Mr. and Mrs. Fledderman filed an adversary complaint ("the

Adversary Complaint") against the Debtor.  In the Adversary Complaint, Mr. and Mrs.

Fledderman request that this court determine their claims against the Debtor to be

nondischargeable pursuant to 11 U.S.C. §§523(a)(2)(A) and (a)(6).  The Debtor filed a Motion to

Dismiss the §523(a)(2)(A) claim only.  In a separate opinion, I have granted that motion, but I

also have granted Mr. and Mrs. Fledderman leave to amend the Adversary Complaint.  I fully

expect that Mr. and Mrs. Fledderman will amend the Adversary Complaint and plead additional

facts to cure the problem which rendered the initial Adversary Complaint legally insufficient.

On November 29, 2005, Mr. and Mrs. Fledderman filed a Motion to Dismiss this chapter
7 bankruptcy case on the ground that it was not filed in good faith and a Motion to Modify the
Automatic Stay. The Debtor filed a written response to both motions. On March 2, 2006, a
consolidated evidentiary hearing was held on both motions. At the hearing, state court counsel
for both Mr. and Mrs. Fledderman and the Debtor testified. The Debtor also testified at some
length. At the conclusion of the hearing, I took both matters under advisement.

## III. FINDINGS OF FACT

### The Debtor's Background

1. Dr. Richard Paul Glunk ("the Debtor") is the debtor in this bankruptcy case.

2. The Debtor is a 1982 graduate of the Medical College of Pennsylvania.

3. From 1982 though 1987, the Debtor completed his residency.

4. Immediately following his residency, the Debtor took a position on the teaching staff of the
   Medical College of Pennsylvania.

5. Some time in 1988 or 1989, the Debtor left his position on the teaching staff at the Medical
   College of Pennsylvania and formed Main Line Plastic Surgery and Laser Associates ("Main
   Line PSLA").

6. The Debtor practiced medicine through Main Line PSLA until early 2002.

7. The Debtor is board certified in plastic surgery. He is a member of the American Society of
   Plastic Surgeons, the American Society of Aesthetic Plastic Surgeons and the Lipoplasty
   Society.

-3-

8.   Debtor is licensed to practice in Pennsylvania, New Jersey, Delaware and New York. He is
     on inactive status in California.

9.   His practice consists entirely of elective surgery: liposuction, face lifts, botox injections,
     abdomoplasty and breast augmentation.

10.  His license has never been revoked in any jurisdiction.

11.  The Debtor is married to Anne M. Stanley Glunk ("Mrs. Glunk"). They were married in
     1997. They have one (1) child, a son who is five (5) years old.

12.  Prior to the marriage, the Debtor's annual income ranged between $300,000.00 and
     $400,000.00. During that period of time, he put substantial amounts of his income into
     retirement accounts.


**The Treatment of Amy Fledderman**

13.  On or about May 23, 2001, the Debtor performed a liposuction procedure on Amy
     Fledderman.

14.  The procedure was conducted at the offices of Main Line PSLA.

15.  Following the procedure, Amy Fledderman was transferred to Montgomery Hospital.

16.  On May 25, 2001, Amy Fledderman was transferred from Montgomery Hospital to the
     Hospital of the University of Pennsylvania where she died on May 25, 2001.

17.  At the time of her death, Amy Fledderman was eighteen (18) years old.


**The Fledderman State Court Litigation**

18.  Mr. and Mrs. Fledderman are the parents of Amy Fledderman.

-4-

19. On August 31, 2001, Mr. and Mrs. Fledderman in their capacities as co-administrators of the AF Estate[1] and Mrs. Fledderman in her own right filed the CP Complaint against the Debtor and various other Defendants (collectively "the Other CP Defendants").[2]

20. In the CP Action, Mr. and Mrs. Fledderman are represented by Slade McLaughlin of the Beasley Law Firm.

21. In the CP Complaint, Mr. and Mrs. Fledderman asserted the following claims:

    a. a negligence claim against the Debtor and certain of the Other CP Defendants;

    b. a claim for lack of informed consent and battery against the Debtor and certain of the Other CP Defendants;

    c. a claim for punitive and exemplary damages against the Debtor and certain of the Other CP Defendants.

22. In the CP Complaint, Mrs. Fledderman asserted a claim for negligent infliction of emotional distress against the Debtor and certain of the Other CP Defendants.

23. In the CP Complaint, Mr. and Mrs. Fledderman also alleged, inter alia, that:

    a. the liposuction procedure performed on Amy Fledderman took place at the office of Main Line PSLA on May 23, 2001;

    b. the Debtor misrepresented that an anesthesiologist would be present to administer anesthesia and post-anesthesia care during the surgical procedure;

---

[1] The Complaint asserts that: (1) Mr. and Mrs. Fledderman have authority to bring an action for wrongful death pursuant to 42 Pa. Cons. Stat. Ann. §8301 and Pa. R. Civ. P. 2202(a); and (2) Mr. and Mrs. Fledderman have authority to bring a survival action on behalf of the AFM Estate pursuant to 20 Pa. Cons. Stat. Ann. §3373 and 42 Pa. Cons. Stat. Ann. §8302.

[2] The other Defendants named in the CP Complaint were Main Line PSLA, Main Line Health, Inc., Jefferson Health System, Inc., Montgomery Hospital, Trustees of the University of Pennsylvania and the Hospital of the University of Pennsylvania. Subsequent to the filing of the Complaint, Montgomery Hospital was dismissed as a Defendant.

      c.  when Amy Fledderman did not come out of anesthesia in the ordinary course
following surgery, the Debtor resisted Mrs. Fledderman's requests that Amy be
transferred to a hospital.

24. The Debtor denies liability on behalf of himself and Main Line PSLA in the CP Action.

25. The defense for the Debtor and Main Line PSLA has been provided by their professional

liability carrier, Clarendon National Insurance Co. ("Clarendon").

26. The law firm representing the Debtor and Main Line PSLA is McKissock & Hoffman, P.C.

27. The professional liability insurance, which may cover the claims asserted against the Debtor

and Main Line PSLA in the CP Action, consists of two (2) components. The first

component is a policy the Debtor purchased from Clarendon, which provides coverage in the

amount of $400,000.00. The second component consists of $800,000, which is available for

payment of the claims asserted in the CP Action, provided through the Pennsylvania

MCARE Fund. Thus, the insurance benefits that may be available for payment of the claims

asserted in the CP Action total $1.2 million.

28. On June 10, 2005, through counsel, the Debtor and Main Line PSLA "offered the policy" of

$1.2 million to Mr. and Mrs. Fledderman in settlement of the CP Action.

29. In July 2005, Mr. and Mrs. Fledderman rejected the settlement offer of $1.2 million. They

wish to proceed with trial of the CP Action in order to obtain a judgment against the Debtor

and the Other CP Defendants for an amount in excess of the $1.2 million settlement offer.[3]

---

[3] Mr. and Mrs. Fledderman's state court counsel, Mr. McLaughlin, testified that Mr. and
Mrs. Fledderman have rejected the settlement offer because a release of the Debtor would, as a
matter of law, release the Other CP Defendants from the claims asserted against them. Mr.
McLaughlin opined that a release of the Debtor in a settlement would have this effect on the
claims against the Other CP Defendants because the claims against the Other CP Defendants are
based on theories of "vicarious liability." In resolving the pending motions, it is unnecessary to

30. Western Litigation Specialist, Inc. ("WLS") is a company that serves as an "administrator"

for Clarendon with respect to the claims against the Debtor asserted in the CP Action.

31. On August 24, 2005, WLS sent a letter to the Debtor ("the WLS Letter") confirming that the

full amount of the insurance policy coverage was tendered in order to settle the CP Action.

32. The WLS Letter also states:

> in the event this matter is not settled and proceeds to trial, this letter is to remind
> you that the total amount of coverage available to you may not be sufficient to
> satisfy a verdict or judgement rendered against you in this matter.  Clarendon
> National Insurance Company will not be responsible for any amounts awarded in
> excess of its policy limits of $400,000.00.

33. The WLS Letter also states:

> *This letter will serve to advise that [Clarendon] provides no coverage for those*
> *causes of action which are not part of a medical incident.  This would include the*
> *allegations of common law fraud, intentional misrepresentation and breach of*
> *fiduciary duty.*  (Emphasis in original).

34. The WLS Letter also states:

> I have been advised that you are represented by personal counsel.  At this time I urge
> you to seek and retain personal counsel to advise you how to best protect your rights
> and interest with regard to the issues discussed in this letter and any possible
> exposure you may face for those claims arising outside the scope of [Clarendon's]
> coverage.
>
> This is to further advise you that  you have the right to retain personal counsel at
> your own expense to advise you regarding any uninsured damages, which may be
> awarded as a result of a trial of this case.

35. The Debtor has received legal advice recommending that he obtain separate counsel in the

---

determine whether Mr. McLaughlin's legal analysis is correct.

CP Action.[4]

36. In the CP Action, the opposing parties have retained the services of expert medical witnesses who have prepared conflicting expert reports in support of the parties' respective positions.

37. Trial of the CP Action will involve approximately 30-40 witnesses, including numerous experts, and is expected to last three (3) to four (4) weeks. It is scheduled as a jury trial.

38. Trial of the CP Action was scheduled to begin on September 19, 2005, twenty (20) days prior to the filing of the Debtor's bankruptcy case.


**Changes in the Debtor's Professional Life After May 25, 2001**

39. The death of Amy Fledderman resulted in significant adverse publicity to the Debtor and the medical practice he operated through Main Line PSLA.

40. Since 2002, the Debtor has been practicing medicine through Richard P. Glunk M.D., LLC ("Glunk LLC"). The transition from the use of Main Line PSLA to Glunk LLC as the Debtor's operating entity for his medical practice was caused by adverse publicity Main Line PSLA received after Amy Fledderman's death.

41. From 2003 though 2005, the Debtor worked part-time in the office of another doctor in Maryland. For some of this time, the Debtor actually leased space from the doctor in Maryland. However, the Debtor ceased this activity in later half of 2005 because it was not generating enough income to make the travel to/from Maryland worthwhile. This business

_____

[4]John Filorreto, an attorney with McKissock Hoffman, testified that if a claim in excess of insurance coverage is asserted in medical malpractice litigation, defendants frequently obtain counsel separate from the attorney provided by the Defendants's insurance carrier. I credit this testimony.

activity was done through Glunk LLC.

## The Bankruptcy Filing

42. The Debtor first met with his present bankruptcy counsel in 2001 as a result of the CP

    Action. At that time, the assets that he owned jointly with Mrs. Glunk as of the

    commencement of this bankruptcy case (described in more detail below in Findings of Fact

    Nos. 51 et seq.) were already held jointly with Mrs. Glunk. As a result of that meeting, the

    Debtor understood the protection given to property owned by tenants of the entireties in

    Pennsylvania.

43. The Debtor made the decision to file this bankruptcy case after receiving the WLS Letter.

    By that time, he was convinced that he would be unable to settle the CP Action and that he

    would have to hire a private attorney to represent his interests. He believed that he did not

    have sufficient funds to pay for counsel, except for the assets jointly owned with Mrs.

    Glunk, which are, of course, of considerable value.

44. The Debtor commenced this case by filing a voluntary petition under chapter 7 of the

    Bankruptcy Code on August 31, 2005.

45. The Debtor's goal in seeking a bankruptcy discharge was, at least in part, to avoid the need

    for a trial of the CP Action and the potential for additional negative publicity that the Debtor

    believed a trial would bring. The Debtor subjectively believed that avoidance of the

    negative publicity would assist him in obtaining a fresh start so that his medical practice

    could return to its historic profitability.

46. Mrs. Glunk is not a co-debtor in this bankruptcy case.

47. On November 10, 2005, the Debtor appeared for the Meeting of Creditors pursuant to 11

U.S.C. §341(a).

48. The Chapter 7 Trustee in this matter is Gloria Satriale ("the Trustee").

49. On November 28, 2005, the Trustee completed her review of the Debtor's assets and

financial affairs, concluded the Meeting of Creditors and filed a Report of No Distribution.

## The Disclosures in the Bankruptcy Schedules and Statement of Financial Affairs

### Schedule A

50. In Schedule A of the Debtor's bankruptcy schedules, the Debtor listed an ownership interest,

as a tenant by the entireties, of a "primary residence and horse farm" located at 209 Spring

Road, Malvern, Pennsylvania ("the Real Property"). The Debtor listed the current market

vale of the Real Property as $4.75 million.[5]

### Schedule B

51. In Schedule B, the Debtor listed the following assets:

   a. an ownership interest as a tenant by the entireties in five (5) accounts with financial
   institutions in the total amount of approximately $180,000.00 ("the Financial
   Accounts");

   b. as a tenant by the entireties in two (2) brokerage accounts maintained at Brown and
   Company in the aggregate amount of approximately $460,000.00 and an account at
   Janne Montgomery Scott, LLC in the amount of $43,588.00 ("the Brokerage
   Accounts");

   c. two (2) retirement accounts (SCI Investments and Schwab One) in the aggregate

---

[5] At the time the Debtor completed Schedule A, he estimated the fair market value of the
Real Property at 4.75 million. Upon further reflection, he believes that the value is 3.3 million.

amount of approximately $423,000.00 ("the Retirement Accounts");

d.  three (3) term life insurance policies, stating that the policies had no cash surrender value;

e.  "other personal property," in the form of a joint ownership interest in an "operation of rental business on horse farm (value of interest in horse farm reflected in value of Real Property on Schedule A)," disclosed as having a value of $0.00;[6]

f.  his interest in Main Line Plastic Surgery and Laser Associates, LTD ("Main Line"), disclosed as having a value of $0.00;

g.  his interest in Glunk LLC, disclosed as having a value of $0.00.


## Schedule C

52. In Schedule C, the Debtor claimed as exempt his interest in

a.  the Real Property, pursuant to 11 U.S.C. §522(b)(2)(B);

b.  the Financial Accounts, pursuant to 11 U.S.C. §522(b)(2)(B);

c.  the Brokerage Accounts, pursuant to 11 U.S.C. §522(b)(2)(B);

d.  the Retirement Accounts as exempt pursuant to 42 Pa. Cons. Stat. §8124(b)(1)(ix);

e.  the term life insurance policies, pursuant to 42 Pa. Cons. Stat. §8124(c)(6).

53. No party in interest has filed any objection to the Debtor's claimed exemptions.

---

[6] Presumably, the Debtor listed the value as $0.00 because he included that value as part of the value of the Real Property listed in Schedule A. The Real Property includes 44 acres of land (under a conservation easement) a house, carriage house, a three (3) car garage, three (3) barns, and an enclosed riding ring and horse sheds. All of the structures, except for the residence, comprise the horse farm.

## Schedule D

54. In Schedule D, the Debtor disclosed that the Real Property is encumbered by a mortgage
with a balance of $1,947,375.72.[7]

## Schedule F

55. In Schedule F, the Debtor listed four (4) creditors, other than the Fledderman Estate as
follows:[8]

| | |
|---|---|
| *Capital One (credit card)* | $2,757.09 |
| **PECO Energy Company** | $ 410.86 |
| **United Mileage Plus Visa (credit card)** | $4,339.86 |
| **Verizon** | $ 85.59 |

56. In Schedule F, the Fledderman Estate is listed as holding a contingent, unliquidated and
disputed claim, described as follows: "Fledderman v. Glunk, et al., CCP, August Term 2001,
No. 3619."

## Schedule G

57. In Schedule G, the Debtor listed an executory contract for the lease of an automobile from
Audi Financial Services ("Audi") at $508.00 per month. Mrs. Glunk is jointly liable with
the Debtor on the Audi lease.

---

[7] The Real Property was purchased in 1999 for 2.25 million dollars. It was refinanced in
2002 and again in either 2003 or 2004. The refinancing enabled the Debtor to obtain some cash
and to lower the interest rate on the loan. The cash taken out was put into the Financial
Accounts.

[8] The Debtor filed an Amended Schedule F. In Amended Schedule F, the Debtor added a
previously unlisted creditor: Exterior Associates, Inc., with a claim of $17,090.00. The claim
arose from roof repair work on the Debtor's residence, which the Debtor found to have been
preformed unsatisfactory. The Debtor testified that in preparing the original Schedule F, he
inadvertently omitted this creditor. I accept the veracity of the Debtor's testimony on this point.

## Schedule I

58. In Schedule I, the Debtor disclosed:

    f.  his occupation as being a doctor and the name of his employer as Glunk LLC;

    g.  that he had no current income from his employment; and

    h.  his sole source of income was $1,000.00 per month derived from "income from

    operation of horse farm".

## Schedule J

59. In Schedule J, the Debtor disclosed current monthly expenditures of $23,907.20 including:

| | |
|---|---|
| Mortgage Payment | $ 10,736.43 |
| Property Taxes | $ 1,100.00 |
| Electricity and Heating Flue | $ 1,100.00 |
| Home Maintenance | $ 600.00 |
| Food | $ 1,000.00 |
| Clothing | $ 1,500.00 |
| Recreation | $ 1,000.00 |
| Homeowner's Insurance | $ 350.00 |
| Life Insurance | $ 524.58 |
| Health Insurance | $ 800.00 |
| Auto Insurance | $ 415.00 |
| Disability Insurance | $ 490.00 |
| Automobile Installment Payments | $ 1,201.19 |
| School Tuition / Camp Expenses for Son | $ 1,750.00 |
| Child Care | $ 400.00 |

## Statement of Financial Affairs

60. In his Statement of Financial Affairs ("SOFA") No. 1, the Debtor disclosed his income from

employment or operation of business as follows:

| | |
|---|---|
| Gross Income in Calendar Year 2003 | $147,431.00 |
| Gross Income in Calendar Year 2004 | $ 25,000.00 |
| Gross Income in Calendar Year 2005 | $ 0.00 |

61. In his SOFA No. 2, the Debtor disclosed his income from sources other than employment of

operation of business as follows:

| | | |
|---|---|---|
| **Farming Income in Calender Year 2003** | $ | **0.00** |
| **Farming Income in Calender Year 2004** | | **$15,000.00** |
| **Farming Income in Calender Year 2005** | | **$ 8,000.00** |

62. In SOFA No. 7, the Debtor disclosed that he made a gift of $11,000.00 to his son "for

educational purposes" on December 31, 2004.


**Other Relevant Facts**

63. In the Debtor's household, there are five (5) motor vehicles and two (2) drivers. The

vehicles are:

   a.  the 2005 Audi referred to in Schedule G;

   b.  2004 Chevrolet Avalanche;

   c.  a Porsche 911 (year unknown, owned by Mrs. Glunk) (purchased for $10,000.00 or
       $11,000.00);

   d.  2003 Land Rover owned by Glunk LLC (presently worth less than the approximate
       $40,000.00 outstanding on the loan which financed the purchase of the vehicle);

   e.  an "old Mercedes," which does not run (owned by Mrs. Glunk).

64. After the filing of the bankruptcy case, the Debtor attempted to obtain a release from the

Audi lease, but Audi was unwilling to release Mrs. Glunk from her obligation under the

lease.[9]

---

[9]The Debtor produced no documentary evidence of this fact. However, I credit his
testimony on this point.

65. The gross receipts of Glunk LLC in 2005 were approximately $526,000.00. The gross receipts in 2004 were approximately $344,000.00. The Debtor testified that the increased revenue in 2005 was consumed entirely by increased expenses and did not result in any additional net income.[10]

66. In 2005, the Debtor and Mrs. Glunk also derived income from Mrs. Glunk's work as a model. In 2005, her gross income from modeling was approximately $30,000.00 - $35,000.00.

67. Presently, the Debtor is drawing no salary from Glunk LLC. His explanation is that he expects that he will be able to draw some compensation from the entity by the end of the calendar year.

68. The income used by the Debtor and Mrs. Glunk to pay for their present living expenses is derived solely from the business activities of the horse farm.

69. The income derived from the horse farm is inadequate to pay the current living expenses of the Debtor and Mrs. Glunk. As a result, the Debtor and Mrs. Glunk are regularly drawing down on the Financial Accounts in order to meet the family's living expenses.

70. The Debtor's son attends private school at the Haverford School. The annual tuition is approximately $20,000.00. The Debtor and Mrs. Glunk pay for the private school expenses by drawing on the Financial Accounts.

71. The Debtor understands that his family's lifestyle may be considered lavish even though he is a bankruptcy debtor. His explanation is that, while his expenditures have been reduced

---

[10] There was no evidence to rebut the Debtor's contention.

-15-

since his income decreased,[11] he has had some difficulty in convincing Mrs. Glunk to cut

back on the family's lifestyle.[12]

72. The Debtor has made no contributions to any of his retirement accounts since 2001.

73. The Debtor has made no contributions to any of the investment accounts since 2001.

# IV. DISCUSSION

## A. Introduction

In their Motion to Dismiss Bankruptcy Case Pursuant to 11 U.S.C. §707(a), Mr. and Mrs.

Fledderman assert that this bankruptcy case should be dismissed because the Debtor did not file

the case in "good faith." In their Motion to Modify the Automatic Stay, they seek leave to

proceed with trial of the CP Action and collection of available insurance benefits to pay any

judgment that may be entered in their favor in state court. Under the terms of the stay relief order

sought by Mr. and Mrs. Fledderman, they would continue to be restrained from executing on any

assets of the Debtor based on any judgment that may be entered in their favor in state court unless

they are authorized by a subsequent order of this court, this bankruptcy case is dismissed or their

claim is determined to be nondischargeable by this court.

If the Motion to Dismiss is granted, it will be unnecessary to decide the Motion to Modify

the Automatic Stay. Therefore, I begin my analysis with the determination which must be made

---

[11] The Debtor testified that he has personally reduced his spending on clothing, that vacations have been cut back and that dining out and his participation in social functions have similarly been reduced. I credit the Debtor's testimony.

[12] From the Debtor's testimony, I infer that he believes Mrs. Glunk's sense of entitlement may be derived from her joint ownership of the family's considerable assets and the fact that she has been generating more income for the family than the Debtor in the past few years.

-16-

under 11 U.S.C. §707(a).

## B. The Motion to Dismiss Will Be Denied

### 1. standards for determination of good faith under 11 U.S.C. §707(a)

Section 707(a) of the Bankruptcy Code provides:

> (a) The court may dismiss a case under this chapter only after notice and a hearing and
> only for cause, including--
>
> > (1) unreasonable delay by the debtor that is prejudicial to creditors;
> >
> > (2) nonpayment of any fees or charges required under chapter 123 of title 28; and
> >
> > (3) failure of the debtor in a voluntary case to file, within fifteen days or such
> > additional time as the court may allow after the filing of the petition commencing
> > such case, the information required by paragraph (1) of section 521, but only on a
> > motion by the United States trustee.

11 U.S.C. §707(a).

Two observations can be made readily based on the text of §707(a). First, the illustrative
grounds for dismissal of a chapter 7 case all involve conduct arising during the administration of
an already filed case as opposed to prepetition conduct. Second, the statute's use of the term
"including" means that the three enumerated grounds for dismissal are illustrative and not
exhaustive. E.g., 6 Collier on Bankruptcy ¶707.03[1], at 707-15 (15th rev. ed. 2005); In re
Marks, 174 B.R. 37, 40 (E.D. Pa.,1994); see H.R. Rep. No. 595, 95th Cong., 1st Sess. 380
(1977).

The term "good faith" is not found in §707(a). By comparison, the lack of good faith is

an explicit basis for dismissal of a petition under chapter 9. 11 U.S.C. §921.[13] Thus, it is not

surprising that there has been some debate as to whether there is a "good faith" filing requirement

in chapter 7 cases, and whether the absence of good faith is a ground for dismissal of a chapter 7

case. See In re Padilla, 222 F.3d 1184, 1191 (9th Cir. 2000) (collecting cases). Compare In re

Huckfeldt, 39 F.3d 829, 832 (8th Cir. 1994) (adopting a "narrow, cautious approach" in which

the inquiry under §707(a) is whether there is "cause" for dismissal, but permitting conduct which

may be characterized as bad faith to be considered as a basis for dismissal) with In re Marks, 174

B.R. at 40 (good faith requirement is an "implicit requirement" for filing a chapter 7 case).

In this Circuit, the issue was resolved definitively in In re Tamecki, 229 F.3d 205 (3d Cir.

2000). In Tamecki, the court held that in a chapter 7 case, a bankruptcy court may dismiss a

petition "for cause if the petitioner fails to demonstrate his good faith in filing." Id. at 207.[14]

---

[13] One commentator suggests that this textual omission, as well as policy reasons, should control the issue, especially when the text of §707(a) is also contrasted with the explicit requirement in chapters 11, 12 and 13 that a reorganization or rehabilitation plan be proposed in good faith. K.T. Kimlinger and W.P. Wassweiler, The Good Faith Fable of 11 U.S.C. §707(a): How Bankruptcy Courts Have Invented a Good Faith Filing Requirement for Chapter 7 Debtors, 13 Bankr. Dev. J. 61, 64 (1996) ("Kimlinger and Wassweiler").

[14] In Tamecki, the court also held that once a movant "calls into question" a debtor's good faith, it becomes the debtor's burden to establish that the petition was filed in good faith. Id. at 207. It may not be entirely clear what a movant must do to "appropriately put at issue," 229 F.3d at 208 (Alito, J., concurring), a debtor's good faith so as to shift the burden to the debtor. In Tamecki, the panel concluded that where the debtor had much greater access to the relevant facts, the facts that were known to the movant (and presumably made part of the hearing record) were sufficient to meet the objector's burden of production "[u]nder the particular circumstances of this case." Id. As discussed below in Part IV.B.2, the shifting burdens holding of Tamecki is easy to apply in the case at bar. Mr. and Mrs. Fledderman presented ample evidence to put the Debtor's good faith at issue. The more substantial issue is whether the Debtor met his burden of proving his good faith.

-18-

In Tamecki, the court provided the following guidance for determining whether a

dismissal for lack of good faith is appropriate:

> [A]t the very least, good faith requires a showing of honest intention . . .
> Dismissal based on lack of good faith . . . should be confined carefully and is
> generally utilized only in those egregious cases that entail concealed or
> misrepresented assets and/or sources of income, lavish lifestyles, and intention to
> avoid a large single debt based upon conduct akin to fraud, misconduct or gross
> negligence. Courts can determine good faith only on an ad hoc basis and must
> decide whether the petitioner has abused the provisions, purpose, or spirit of
> bankruptcy law. The parties agree that the decision to dismiss a petition for lack of
> good faith rests within the sound discretion of the bankruptcy court.

Id. (citing and quoting In re Zick, 931 F.2d 1124, 1131 (6th Cir. 1991); In re Marks, 174 B.R. at

40; In re Atlas Supply Corp., 857 F.2d 1061, 1063 (5th Cir. 1988)).

In evaluating whether to dismiss a chapter 7 case for bad faith under §707(a), courts have

considered a variety of factors. One expansive list of factors was set forth in In re Keobapha:

1.  the debtor reduced his creditors to a single creditor in the months prior to
    filing his petition;
2.  the debtor failed to make lifestyle adjustments or continued living an
    expansive or lavish lifestyle;
3.  the debtor filed the case in response to a judgment pending litigation;
4.  the debtor made no effort to repay his debts;
5.  the unfairness of the use of Chapter 7;
6.  the debtor has sufficient resources to pay his debts;
7.  the debtor is paying debts to insiders;
8.  the schedules inflate expenses to disguise financial well-being;
9.  the debtor transferred assets;
10. the debtor is over-utilizing the protection of the Code to the unconscionable
    detriment of creditors;
11. the debtor employed a deliberate and persistent pattern of evading a single
    major creditor;

12. the debtor failed to make candid and full disclosure;

13. the debts are modest in relation to assets and income; and

14. there are multiple bankruptcy filings or other procedural "gymnastics."

279 B.R. 49, 52 (Bankr. D. Conn. 2002); accord, In re Lichtenstein, 328 B.R. 513, 515 (W.D.

Ky. 2005). See generally In re Myers, 334 B.R. 136 (E.D. Pa. 2005) (affirming bad faith

dismissal of chapter 7 case by bankruptcy court which employed "totality of the circumstances"

analysis).

In bankruptcy cases, the use of this kind of "totality of the circumstances" analysis has

been employed in a variety of contexts, including the evaluation of :

1. relief from stay for "cause" under §362(d);[15]

2. good faith filing in chapter 13 cases,[16]

3. good faith in chapter 11 cases;[17]

4. dismissal of chapter 7 cases under §707(b) for substantial abuse;[18]

5. the justification given for the failure to maintain financial records in a denial

---

[15] See, e.g., In re Wilson, 116 F.3d 87, 91 (3d Cir. 1997).

[16] See, e.g., In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996).

[17] See, e.g., In re Integrated Telecom Express, Inc., 384 F.3d 108, 118-125 (3d Cir. 2004)
(good faith in filing of case); Corestates Bank, N.A. v. United Chemical Technologies, 202 B.R.
33, 57 (E.D. Pa. 1996) (good faith in filing of plan).

[18] See, e.g., In re Green, 934 F.2d 568, 572-73 (4th Cir. 1991); In re Savoie, 2005 WL
2476268, at * 2 (Bankr. E.D. Pa. October 6, 2005), reaff'd on reconsideration, 2006 WL 893610
(Bankr. E.D. Pa. March 9, 2006). See also In re Miller, 335 B.R. 335, 340 (Bankr. E.D. Pa.
2005) (adopting hybrid/totality of the circumstances standard).

-20-

of discharge proceeding under 11 U.S.C. §707(a)(3);[19]

6.   the good faith "prong" in the determination of "undue hardship" in a student
     loan dischargeability proceeding under 11 U.S.C. §523(a)(8).[20]

7.   the "disposable income test" for chapter 13 plan confirmation under
     §1325(b);[21]

8.   excusable neglect under Fed. R. Bankr. P. 9006 so as to permit a party to file
     an untimely proof of claim,[22]

9.   whether fraudulent intent should be inferred after consideration of various
     "badges of fraud" in a denial of discharge proceeding under §727(a)[23] or a
     transfer avoidance proceeding under §548;[24]

10.  whether consideration is of reasonably equivalent value in a transfer
     avoidance proceeding under §548,[25]

There are legitimate jurisprudential concerns that arise when courts employ a "totality of

the circumstances" analysis in deciding issues that play a significant role in the outcome of legal

proceeding.

---

[19] See, e.g., In re Ryan, 285 B.R. 624, 630-631 (Bankr. W.D. Pa. 2002).

[20] See, e.g., In re Alston, 297 B.R. 410, 417 (Bankr. E.D. Pa. 2003); In re Newman, 304
B.R. 188, 195-96 (Bankr. E.D. Pa. 2002).

[21] See, e.g., In re Navarro, 83 B.R. 348, 355 (Bankr. E.D. Pa. 1988).

[22] See, e.g., Chemetron Corp. v. Jones, 72 F.3d 341, 349-50 (3d Cir. 1995).

[23] See, e.g., In re Bernier, 282 B.R. 773, 781-84 (Bankr. D. Del. 2002).

[24] See, e.g., In re Harris, 2003 WL 23096966, at *2 (Bankr. D. Del. December 30, 2003).

[25] See, e.g., Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to
Fruehaf Trailer Corporation Retirement Plan No. 003, 319 B.R. 76, 87 (Bankr. D. Del. 2005).

The primary concern is that the court's analysis will lapse into an inquiry, which "may

clothe subjective moral judgments with the force of law." Sarasota, Inc. v. Weaver, 2004 WL

2514290, at *3 (E.D. Pa. November 5, 2004) (quoting In re Woodman, 287 B.R. 589, 592

(Bankr. D. Me. 2003), aff'd 2003 WL 23709465 (D. Me. September 19, 2003), aff'd 379 F.3d 1

(1st Cir. 2004) (relating to disposable income test for chapter 13 plan confirmation under

§1325(b)); accord, In re Keach, 243 B.R. 851, 867 (1st Cir. B.A.P. 2000) (in context of good faith

inquiry in chapter 13 case, pointing out the danger of "[a]pplying individualized standards of

moralistic decision-making reserved only for Congress"). See also In re Devine, 1998 WL

386380, at *5 (Bankr. E.D. Pa., July 7, 1998) (acknowledging subjectivity of judicial

determinations under the chapter 13 disposable income test); In re Gonzales, 157 B.R. 604

(Bankr. E.D. Mich. 1993).

        Some courts have acknowledged that a "totality of the circumstances" determination

under §707(a) may involve the application of a "smell test" by the court.  In re Zick, 931 F.2d at

1127-28; Morgan v. Fiduciary, Ltd. v. Citizens and Southern Bank, 95 B.R. 232, 234 (Bankr.

S.D. Fla. 1988); In re Hammonds, 139 B.R. 535 (Bankr. D. Colo. 1992).  At the same time, the

use of the "smell test" to decide whether a debtor is entitled to invoke relief under chapter 7 has

been criticized harshly:

> Smell is an adaptive sense. What smells bad to one person might be perfume to
> another. Rather, it appears to us that a "smell test" is simply the ultimate surrender to
> moralistic selectivism and an abdication of principled decision-making, *i.e.,* it smells
> bad, I don't like it, get it out of here, don't ask me for reasons. We suggest that
> decision-making must be more principled and orderly than that.

-22-

In re Landes, 195 B.R. 855, 863 (Bankr. E.D. Pa. 1996).[26]

Justice Scalia has suggested that use of a "totality of the circumstances" test as the

explanation for a judicial decision "amounts to not so much pronouncing the law in the normal

sense as engaging in the less exalted function of fact finding." A. Scalia, The Rule of Law As a

Law of Rules, 56 U. Chi. L. Rev. 1175, 1180-81 (1989). If this conceptualization is accurate, it

may follow that consideration of precedent should play a less significant role in a court's decision

making process. As the court observed in In re Crater:

> There are many areas of bankruptcy law where Congress apparently intended
> bankruptcy judges to weigh the evidence and utilize their experience and
> judgment to decide individual cases on a case by case basis. It does so by using
> terms that are inherently incapable of fine definition, such as "good faith,"
> "substantial abuse," "undue hardship," and the like. Case law in such areas tends
> to identify "factors" that in reality are merely a checklist of relevant facts or issues
> to consider, none of which is dispositive. Perhaps such areas of bankruptcy law
> are best dealt with as in the civil system, with each judge reading and applying the
> statute and its underlying policies and principles to each factual situation that
> comes up, without regard to what the last judge did on different facts. Reported
> decisions in such areas serve little useful purpose, and in fact may be
> counterproductive.

286 B.R. 756, 772 (Bankr. D. Az. 2002).

This discussion suggests that the types of decisions that Congress delegated to the

bankruptcy court's discretion, based on general standards such as "cause," are inherently

subjective and that achieving the goals of rendering judicial decisions based on "clear rules"[27]

---

[26] I recognize that the specific holding of Landes – that there is no good faith filing requirement under chapter 7 – is no longer good law in this Circuit after Tamecki. Nonetheless, the court's critique of the "smell test" remains food for thought.

[27] In re Keach, 243 B.R. at 870.

and "predictable and consistent"[28] outcomes is a chimerical endeavor. However, as explained

below, I am not so pessimistic. It may be possible to further refine the application of the

numerous factors, which are employed in the totality of the circumstances test under §707(a), in

the pursuit of principled decisionmaking.

In evaluating the good faith of a debtor's filing under §707(a), I am guided by three

principles.

First, the lack of good faith dismissal doctrine under §707(a) is a narrow one. A broad

application of the doctrine would create an undue risk of judicial usurpation of the legislative

power to determine the scope of and eligibility for the relief available in chapter 7 bankruptcy

cases. See, e.g., In re Johnson, 80 B.R. 953, 963 (Bankr. D. Minn. 1987). I read Tamecki to

similarly instruct that the bad faith dismissal doctrine in chapter 7 cases is a narrow doctrine,

which should be employed only in extreme cases to protect the integrity of the bankruptcy

system. On this point, all three members of the divided Tamecki panel agreed. See 229 F.3d at

209 ("bankruptcy and district courts have reserved bad faith dismissal for the truly egregious

case, often involving individuals with substantial means who have flaunted their wealth, have

continued their lavish lifestyles, and are engaging in creative, elaborate schemes to conceal their

assets and cheat their creditors or to otherwise inflict harm on third parties") (Rendell, J.,

dissenting).

Second, in evaluating the propriety of dismissal, I must be mindful of the delicate balance

---

[28] Rebecca Ellen Bruck, Lessons In Eliminating Statutory Vagueness: Rule 11 of the
FRCP As A Model for Removing the "Good Faith" Fulcrum from Section 707(a) of the
Bankruptcy Code, 19 Bankr. Dev. J. 399, 421 (Spring 2003).

of rights and remedies afforded to debtors and creditors under the Bankruptcy Code. Therefore, I

must consider whether other provisions of the Bankruptcy Code or the Judicial Code are

adequate to vindicate the legitimate interests of the party who seeks dismissal for bad faith or to

otherwise protect the integrity of the bankruptcy process. Those provisions include: 11 U.S.C.

§362(d) (modification of the automatic stay); 28 U.S.C. §1334(c) (abstention); 11 U.S.C.

§523(a)(2) (determination of the dischargeability of a debt); 11 U.S.C. §707(b) (dismissal for

abuse) and 11 U.S.C. §727(a) (objections to discharge).

If other provisions already embedded in the Code are up to the task of ensuring the proper

functioning of the bankruptcy system, there is no reason to invoke the narrow doctrine of

dismissal for lack of good faith.[29] I find support for this principle in the caselaw governing

dismissal of cases as a sanction for failure to comply with the rules governing pretrial discovery

in civil litigation. Much like the description employed in Tamecki, such dismissals have been

characterized as "extreme." Poulis v. State Farm Fire and Casualty Co., 747 F.2d 863, 867-68

(3d Cir. 1984) (quoting National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S.

639, 643, 96 S.Ct. 2778, 2281 (1976)). Before a proceeding is dismissed as a discovery sanction,

it is appropriate for the court to contemplate other remedies as dismissal is considered to be the

remedy of "last resort." Id. at 869; Ali v. Sims, 788 F.2d 954, 958 (there is a "strong

---

[29] The dismissal of a chapter 7 case based on the non-textual, good faith filing
requirement implied in §707(a) may also be viewed as analogous to the court's use of its inherent
power to sanction an attorney or a party for misconduct. This inherent power exists "to fill in the
interstices" left by statutory and rules-based remedial provisions and to ensure that a remedy is
available to vindicate the court's authority. Fellheimer, Eichen & Braverman, P.C. v. Charter
Technologies, Inc., 57 F.3d 1215, 1224 (3d Cir. 1995) (quoting Chambers v. NASCO, Inc., 501
U.S. 32, 46, 111 S.Ct. 2123, 2134 (1991)).

presumption against sanctions that decide the issues of a case"); Haraway v. National Ass'n For

Stock Car Auto Racing, Inc., 213 F.R.D. 161, 164 (D. Del. 2003); Winters v. Textron, Inc., 187

F.R.D. 518, 521 (M.D. Pa. 1999).

    Third, varying weight should be accorded to the several factors utilized in the totality of

the circumstances analysis under §707(a). In doing so, I acknowledge the influence of the court's

thoughtful opinion in In re Crater. In Crater, the court engaged in a deconstruction of the "badges

of fraud" used by courts to determine the existence or non-existence of an actual intent to hinder,

delay or defraud creditors so as to support a denial of discharge under 11 U.S.C. §727(a).[30] The

---

[30] As noted by the court in Crater, "badges of fraud" are currently creatures of statute,
i.e., the Uniform Fraudulent Transfer Act. The badges of fraud "are not codified as appropriate
grounds for denial of discharge pursuant to § 727(a)(2)(A) . . . But they have been long
recognized . . . as grounds for finding the . . . statutory element that is found in § 727(a)(2)(A)-
"actual intent to hinder, delay or defraud"-when it is an element of a fraudulent transfer. 286
B.R. at 764. The eleven badges of fraud are:

1. The transfer or obligation was to an insider.

2. The debtor retained possession or control of the property transferred after the transfer.

3. The transfer or obligation was disclosed or concealed.

4. Before the transfer was made or obligation was incurred, the debtor had been sued or
   threatened with suit.

5. The transfer was of substantially all of the debtor's assets.

6. The debtor absconded.

7. The debtor removed or concealed assets.

8. The value of the consideration received by the debtor was reasonably equivalent to the value of
   the asset transferred or the amount of the obligation incurred.

9. The debtor was insolvent or became insolvent shortly after the transfer was made or the

court in <u>Crater</u> divided the "badges" into three categories: (1) ones that directly indicate

concealment, deception or fraudulent intent; (2) ones that do not implicitly suggest fraud, but

imply that a particular transaction intended to hinder or delay creditors because there is no

obvious economically rational motive for the transaction; and (3) ones that are generally innocent

in and of themselves, but become suspect only because of the timing or the existence of other

factors. 286 B.R. at 764. In analyzing the weight to afford to the three (3) categories, the court

concluded that because certain badges were not "intrinsically indicative of fraudulent intent,"

they would not amount to "sufficient evidence of actual fraud to compel a denial of discharge."

<u>Id</u>. at 766. The <u>Crater</u> court explained:

> To be more precise, those badges of fraud that fall into the second and third
> categories identified above are neither sufficient to sustain summary judgment for
> the creditor, nor to shift the burden of going forward to the debtor. In short, they
> do not establish a prima facie case for denial of discharge, even when conjoined
> with prebankruptcy exemption planning. They really do nothing more than
> demonstrate that the debtor engaged in otherwise permissible exemption planning
> only when it became apparent that it would be intelligent to do so, and was willing
> to sacrifice some asset values to achieve the exemption.

<u>Id</u>.

Using the <u>Crater</u> court's approach as guidance, I have condensed the <u>Keobapha</u> court's

fourteen factors into the following five (5) categories:

___

obligation was incurred.

10. The transfer occurred shortly before or shortly after a substantial debt was incurred.

11. The debtor transferred the essential assets of the business to a lienor who transferred the
assets to an insider of the debtor.

1.  the debtor's (extravagant) lifestyle and ability to pay (factors 1, 2, 4, 6, 7 and 13);

2.  the disproportionate impact that bankruptcy relief would have on one particular creditor, or only a few creditors, as compared to other creditors (factors 1, 3, 7, 11)

3.  forum shopping or efforts to manipulate the judicial process to thwart the orderly determination of a creditor claim pending in another court (factors 11 and 14);

4.  prepetition fraudulent conduct to place assets beyond the reach of creditors or less than full and candid disclosure in the bankruptcy process itself (factors 8, 9, 12 and 14);

5.  an end result, if bankruptcy relief is permitted, that is perceived to be fundamentally unfair or excessive (factors 5 and 10).[31]

I observe that, unlike the court in Crater, I do **not** conclude that any of the five categories that I identified for analyzing lack of good faith is **legally insufficient**, by itself, to justify the dismissal of a chapter 7 bankruptcy case under §707(a). This is because I read Tamecki and its reference to dismissals under §707(a) based on "concealed or misrepresented assets **and/or** sources of income, lavish lifestyles, and intention to avoid a large single debt," 229 F.3d 207 (emphasis added), to give the bankruptcy court the flexibility and authority, in an appropriate case, to dismiss a bankruptcy based on any of the five categories.

Accordingly, I suggest only that certain factors may carry substantially more weight than others. It should be the rare case that merits dismissal for lack of good faith in the absence of some evidence indicative of categories 3 and 4, both of which involve some degree of

---

[31] For a somewhat different set of interpretive categories, see Kimlinger and Wassweiler, 13 Bankr. Dev. J. at 78-79.

misconduct by the debtor. As for category 1, dismissal based on a debtor's ability to pay should

be disfavored given the detailed, explicit standards for dismissal on those grounds that Congress

has established in §707(b). Similarly, dismissals based on categories 2 and 5 would have a

tendency to deny a debtor relief that Congress has provided for by statute based on a court's

subjective sense that the relief is unfair or disproportionate. I fully share the discomfort

expressed by the dissenting judge in <u>Norwest Bank Nebraska, N.A. v. Tveten</u>:

> As a judge, by what criteria do I determine when this pig becomes a hog? . . .
> Debtors deserve more definite answers to these questions . . . [rather than leaving]
> the distinction between permissible and impermissible [conduct] to each
> bankruptcy judge's own sense of proportion.

848 F.2d 871, 879 (8th Cir. 1988).

With the principles discussed above in mind, I now analyze Mr. and Mrs. Fledderman's

contention that the Debtor's chapter 7 case should be dismissed for lack of good faith under

§707(a).

### 2. application of the standards for determination of good faith under 11 U.S.C. §707(a)

Mr. and Mrs. Fledderman make a cogent argument that this case should be dismissed for

lack of good faith. Relying on case law, they draw the court's attention to two circumstances in

this case to buttress their position: (1) the Debtor has one very large debt and almost no other

debt[32] and (2) the Debtor continues to maintain a lavish lifestyle. <u>See, e.g., In re Lichtenstein</u>,

---

[32] This statement is somewhat oversimplified, although accurate for purposes of a
§707(a) lack of good faith analysis. Strictly speaking, the Debtor has substantial debt other than
the disputed claim of Mr. and Mrs. Fledderman: secured debt of almost $2 million, i.e., the
Debtor's home mortgage. But the secured debt undoubtedly will be paid, either through monthly

328 B.R. at 515 ("most significant factor" to court was that debtor filed the case in response to a

judgment, pending litigation, or collection action; there is an intent to avoid a large single debt);

In re Cappucetti, 172 B.R. 37, 39-40 (Bankr. E.D. Ark. 1994) (almost all of the listed debt was

owed to the IRS and the debtor continued to maintain a lavish lifestyle). See also In re Brown,

88 B.R. 280 (Bankr. D. Hawaii 1988) (case of opthamologist seeking discharge of medical

malpractice judgment dismissed for lack of good faith).

      While I agree that Mr. and Mrs. Fledderman put the Debtor's good faith at issue and

shifted the burden to the Debtor, reference to the facts of reported cases has only a limited utility

in the determination whether the Debtor in this case has filed a chapter 7 bankruptcy petition in

good faith. Even using a traditional common law analysis, the primary cases cited by Mr. and

Mrs. Fledderman are distinguishable. In both Lichtenstein and Cappucetti, the cases were

dismissed for lack of good faith because the debtors engaged in some sort of misconduct. See

Cappucetti, 172 B.R. at 40-41 (engaging in prepetition efforts to hide or transfer assets);

Lichtenstein, 328 B.R. at 516 (submitting materially inaccurate financial disclosure in the

bankruptcy case itself, or both). Neither case was dismissed solely because the debtor had only

one primary debt or solely because the debtor continued to maintain a lavish lifestyle.

      Other considerations also mitigate the impact of the two circumstances forming the basis

of Mr. and Mrs. Fledderman's contention that the case was not filed in good faith. As a result, I

am persuaded for several reasons that the Debtor has met his burden of establishing that this

bankruptcy case was filed in good faith.

---

payments while the Debtor resides in the property or through a refinance or sale at some time in
the future.

I ascribe only limited weight to the fact that the Debtor's bankruptcy case undoubtedly was filed as a result of the state court claim asserted by Mr. and Mrs. Fledderman. Frequently, the need for bankruptcy relief is caused by one particular event that upsets the equilibrium in a debtor's pre-bankruptcy economic life. For example, a catastrophic illness can result in one staggering hospital bill. Or, one ruinous business transaction can cause a previously successful small business to fail, leaving the debtor-principal with liability on a very large guaranteed debt. In both circumstances, the debtor may have little prospect of generating sufficient income to repay the one, major debt. These kinds of debtors invoke their rights under the Bankruptcy Code as a means to obtain relief from burdensome debt and obtain a fresh start  −  which are conventional, traditional and acceptable purposes.

These examples illustrate that simply because a debtor has only one primary creditor, that fact by itself cannot ordinarily establish that the debtor's desire to obtain a discharge is an abuse of the purpose, spirit or provisions of the Bankruptcy Code and therefore, may shed little light on the question whether a debtor's filing is good faith. For a debtor's "debt structure" to take on bad faith significance when there is only one primary creditor, ordinarily there must be some other factor at play, such as prepetition machinations to avoid payment, transfer of assets beyond the reach of the main creditor or some undue interference with an orderly judicial process for resolution of the primary debt.

In this case, although the Debtor has one primary debt, I do not find any of the aggravating factors to suggest that this "one creditor bankruptcy" was filed in bad faith. I find it especially significant that no judgment has been rendered on Mr. and Mrs. Fledderman's claim and the Debtor disputes his liability. Further, there is no suggestion that the Debtor has

-31-

transferred any assets out of the ordinary course, or has engineered any sophisticated business

arrangements to shelter assets or wealth he has accumulated since the Plaintiffs' claim arose, that

otherwise might have been available for payment of the claim. During the hearing, Mr. and Mrs.

Fledderman made some effort to suggest that the Debtor was uncooperative and dilatory during

the litigation of the CP Action, but I found their case on this point unpersuasive. It strikes me as

rather commonplace for a major medical malpractice case to take four years to make the

transition from the pleading stage to a trial date. As a bankruptcy judge first encountering the CP

Action more than four years after its filing, I am not well placed to determine the point at which a

zealous and professional defense of a medical malpractice action crosses the line and becomes

vexatious and dilatory conduct. In addition, based on my observation of the Debtor during his

testimony and the content of that testimony, I am satisfied that the Debtor's bankruptcy filing was

not filed as a dilatory tactic aimed at thwarting trial of the CP Action. Rather, I accept the

Debtor's explanation that he subjectively believed that his efforts to settle the matter in good

faith were unsuccessful, that the law permitted him to seek bankruptcy relief and that he had little

choice but to do so.

     Further, while there is but a single large debt in this case, it may well be a debt arising

from mere negligence (i.e., medical malpractice), rather than the type of conduct for which

society holds a debtor to be morally culpable. In making this last observation concerning the

nature of the primary debt, I am aware that Mr. and Mrs. Fledderman have asserted in a separate

adversary action that their claim arises from fraud and willful and malicious conduct. I am not

prejudging the issue of the dischargeability of the debt. I observe only that no court has not

determined the merits of this issue and Mr. and Mrs. Fledderman's assertions are being

-32-

vigorously contested by the Debtor.  If there had been a judicial determination of fraud or willful

and malicious conduct, the outcome of the good faith analysis might have been different in this

case.

    In addition, Mr. and Mrs. Fledderman's entitlement to a judicial determination on their

assertions that the Debtor's conduct involved fraud and willful and malicious conduct can be

vindicated without dismissal of the bankruptcy case.  I will address this issue more directly below

in connection with my decision on their motion for modification of the automatic stay.

Accordingly, the court's ability to protect the legitimate interests of the creditors through relief

less drastic than dismissal of the entire bankruptcy case militates against dismissal of the case for

bad faith.

    The Debtor's lifestyle, at first blush, presents a more troubling issue.  There are few

chapter 7 debtors who reside in a $3 million to $5 million residence, who intend to remain in

property after completion of their bankruptcy case and who own (even jointly) liquid assets in

excess of $500,000.  Regardless of the dangers of judicial subjectivity, the Court of Appeals in

Tamecki has suggested that courts give serious consideration to dismissal of cases involving

"concealed or misrepresented assets and/or sources of income, lavish lifestyles, and intention to

avoid a large single debt based upon conduct akin to fraud, misconduct or gross negligence."

229 F.3d at 207.  If nothing else, bankruptcy cases involving debtors living in mansions while

discharging unsecured debt breeds disrespect for the bankruptcy system and the law generally.

Again, however, it is significant that in this case, there is no evidence of any prepetition

machinations with respect to the Debtor's assets and the substantial assets of the Debtor are

already exempt from judicial process under Pennsylvania law.  I also find it significant that the

-33-

lifestyle that Mr. and Mrs. Fledderman, understandably, find offensive is not funded from the

Debtor's current income.  The Debtor and his spouse are generating very little income in

comparison to their earnings history.  Rather, they are drawing down assets they accumulated

before Mr. and Mrs. Fledderman's claim arose and which are immune from process under state

law, even if Mr. and Mrs. Fledderman obtain a money judgment against the Debtor.  Thus, this is

not a case in which the Debtor diverted prior to his bankruptcy filing or continues to divert, assets

which are available under applicable nonbankruptcy for satisfaction of the primary creditor's

claim.

In short, I conclude that while Mr. and Mrs. Fledderman have made out a preliminarily

sufficient case for dismissal for lack of good faith based on what I have labeled as "category 1

and 2" factors, there also are some aspects in this case mitigating the impact of those factors.

That conclusion and the absence of "category 3 and 4" factors cause me to conclude, in the

exercise of my discretion, that this is not the rare case which merits dismissal for lack of good

faith absent some evidence indicative of misconduct by the Debtor.

Finally, to the extent that I am obliged to make a more generalized determination whether

dismissal of the case is required to prevent an abuse of the purpose or spirit of the Bankruptcy

Code, I also conclude dismissal is not necessary.  In analyzing the overall equities of the case, I

find it useful to compare bankruptcy and non-bankruptcy outcomes.  By doing so, the essence of

the relief that the Debtor is seeking becomes more prominent and aids my evaluation of the

legitimacy of the bankruptcy filing.

If the Debtor was not in bankruptcy, he would be compelled to litigate the merits of the

CP Action. If he is successful in the litigation or a judgment is entered against him within the

limits of the applicable insurance benefits, the problem that caused him to file his chapter 7

bankruptcy petition would be resolved in his favor. Of course, the alternative outcome is a

judgment being entered against the Debtor in an amount substantially in excess of the available

insurance coverage (or the insurance company successfully disclaiming coverage on a substantial

money judgment). In this later scenario, the Debtor would be personally liable and his

individually owned assets would be subject to execution on the judgment. However, virtually all

of the Debtor's current assets cannot be exposed because either they are immune from execution

as property owned as tenants by the entireties or are exempt from execution under Pennsylvania

law.[33] Thus, the Debtor's principal financial exposure in the pending litigation relates to future

assets and wealth he may accumulate from his hoped economic resuscitation of his medical

practice.

The main potential consequence of the Debtor's bankruptcy filing is that a bankruptcy

discharge could eliminate, or at least restrict, Mr. and Mrs. Fledderman's ability to look to future

assets accumulated by the Debtor as a source of payment for any judgment not paid by the

Debtor's insurance coverage. However, it is by no means certain the outcome of this case will be

any different if this bankruptcy case is dismissed. If this case proceeds, Mr. and Mrs.

Fledderman will have a full and fair opportunity to establish that their claim against the Debtor is

nondischargeable, thereby achieving the same outcome they would obtain if this case is

---

[33] Furthermore, since the Debtor has claimed the state exemptions, he obtains nothing
greater in the way of exemptions by filing bankruptcy than that which is already available to him
under state law.

dismissed.

At bottom, what is at stake for the Debtor is whether he can pull free from the weight of

the CP Action (which undoubtedly will consume much of the Debtor's time, physical energy and

psychological energy to defend) and obtain a clear field for his future economic endeavors – or

whether he will remain liable for, individually owned assets subject to execution for, payment of

substantial debt.

The Debtor seeks relief from the burdens imposed by the state court litigation and from an

uncertain economic future. While these are traditional and legitimate purposes of the bankruptcy

discharge, whether the Debtor can obtain the complete relief he seeks will depend on the

outcome of the dischargeability proceeding. If, in the end, I find that the Debtor's actions were

not fraudulent or willful and malicious, I do not see it as an abuse of the Bankruptcy Code to

circumscribe Mr. and Mrs. Fledderman's remedy (assuming that even negligence is established)

to the collection of the available insurance proceeds totaling $1.2 million. To dismiss the

Debtor's bankruptcy case at this stage as a bad faith filing, in my view, would amount to a

prejudging of the allegations in the dischargeability proceeding. Consequently, I find that in this

case, where the Debtor resorted to bankruptcy relief to obtain a discharge of a debt he contends

is, at most, derived from a negligent act, where there is no evidence of prepetition manipulation

of the Debtor's financial affairs to the detriment of his creditors, where there are no

misrepresentations by the Debtor in the bankruptcy process itself, and where the Debtor

maintained a substantial amount of insurance coverage to compensate his primary creditor, the

bankruptcy petition was filed in good faith and a dismissal pursuant to §707(a) is unwarranted.

The next issue then, is to determine which forum – state court or bankruptcy court –

should be the primary forum for resolving the issues between Mr. and Mrs. Fledderman and the

Debtor. I address that issue below.

### C. The Motion to Modify the Automatic Stay Will Be Granted

As stated above, Mr. and Mrs. Fledderman seek leave to proceed with trial of the CP

Action. However, they agree that the automatic stay should remain in place to restrain them from

executing on any of the Debtor's assets based on any state court judgment, which may be entered

in their favor pending further order of this court. In support of their request, they refer to the

existence of $1.2 million in potentially available insurance benefits and emphasize that the

Debtor's insurance carrier is providing his defense in the CP Action at no expense. Further, they

contend that the state court is in the "best position" to determine their claim due to its familiarity

with the four year old case and its expertise in medical malpractice actions. Mr. and Mrs.

Fledderman propose that their claims be tried initially in state court. If a judgment is entered in

their favor for an amount in excess of the available insurance benefits, they suggest that a trial of

limited scope may be necessary in the dischargeability proceeding.

In response, the Debtor emphasizes that he will not receive a free defense in state court if

relief from the automatic stay is granted due to the possibility that a judgment could be entered

against him and covered by his insurance coverage. Therefore, the Debtor argues that as a

practical matter, he would be compelled to incur the cost of retaining separate counsel to

represent his personal interests. The Debtor also argues that there is no "need" to modify the

automatic stay because Mr. and Mrs. Fledderman were offered a settlement based on the

available insurance coverage. Thus, the Debtor argues that a complete resolution for Mr. and

Mrs. Fledderman does not require liquidation by the state court. Rather, the Debtor contends that

the first matter tried should be the determination of the dischargeability of the debt by the

bankruptcy court.

Section 362(d) of the Code provides:

> On request of a party in interest and after notice and a hearing, the court shall
> grant relief from the stay provided under subsection (a) of this section, such as by
> terminating, annulling, modifying, or conditioning such stay--
>> (1) for cause, including the lack of adequate protection of an interest in
>> property of such party in interest

11 U.S.C. §362(d).

In In re Brown, the court described the parameters of §362(d)(1) as follows:

> "Cause" is an intentionally broad and flexible concept which must be determined
> on a case-by-case basis. Indeed, there are a multitude of reported decisions
> discussing relief from the stay for "cause," all of which are fact intensive and
> generally offer no precise standards to determine when "cause" exists to
> successfully obtain relief from the stay. A court may consider the policies
> reflected in the bankruptcy code, and the interests of the debtor, other creditors
> and any other interested parties. Unsecured creditors are generally entitled to relief
> from an automatic stay only in extraordinary circumstances.

311 B.R. 409, 412-413 (E.D. Pa. 2004) (citations omitted)

The most common analysis applied to a request for relief from the automatic stay made

by an unsecured creditor is a balancing test:

> [C]ourts have allowed modification of the Section 362 stay and its predecessor
> under the Bankruptcy Act where no great prejudice to either the estate or the

-38-

debtor would result and where the hardship to the plaintiff caused by the
continuance of the stay outweighs the hardship to the debtor caused by stay
modification.

In re Johns-Manville Corp. 26 B.R. 420, 433 (Bankr. E.D.N.Y. 1983), vacated in part, 41 B.R.

926 (S.D.N.Y. July 31, 1984); accord, In re Causa, 93 B.R. 409, 411 (Bankr. E.D. Pa. 1988); In

re Stranahan Gear Co, Inc., 67 B.R. 834, 838 (Bankr. E.D. Pa. 1986).

Under §362(d)(1), bankruptcy courts have routinely granted relief to permit personal

injury plaintiffs to prosecute their claims in state court and to limit their collection efforts to the

available insurance benefits.  The rationale for granting relief from the automatic stay for this

purpose is that the prejudice to the debtor, who may suffer modest or even no adverse financial

consequences but may only have to expend some time and effort in cooperating with his insurer

in the defense of the litigation, is outweighed by the prejudice to the creditor whose ability to

prosecute the action and reach the insurance benefits may be undermined by the "aging of

evidence, loss of witnesses, and crowded court dockets." In re Bock Laundry Machine Co., 37

B.R. 564, 566 (Bankr. N.D. Ohio 1984); accord, In re Holtkamp, 669 F.2d 505 (7th Cir. 1982); In

re Krank, 84 B.R. 372 (Bankr. E.D. Pa. 1988). See generally Green v. Welsh, 956 F.2d 30, 33-34

(2d Cir. 1992) (similar principles permit tort plaintiff to proceed with claim against debtor in

order to collect from insurance coverage after entry of discharge under §524); General Accident

Fire & Life Assurance v. Amdura Corp. L, 1993 WL 293917, at *2 -3 (E.D. Pa. 1993)

The Debtor's rejoinder is that due to the existence of the Adversary Proceeding, he is

exposed to potential liability far in excess of his insurance coverage and it will be necessary for

him to undergo the expense of hiring counsel separate from the attorney provided for his defense

-39-

by the insurance carrier. Further, since he has "offered the policy" to Mr. and Mrs. Fledderman,
he argues that it is not equitable to require him to incur defense costs on a claim that may be
determined to be dischargeable.

The Debtor's argument is not persuasive. First, the expense of retaining separate counsel
in the CP Action may not be that substantial, relatively speaking, given the respective roles and
responsibilities that I would expect the "insurance counsel" and the "separate counsel" to have
during the trial of the matter. Some courts have even suggested that this discreet expense does
not alter the usual outcome of the balancing of the hardships. See In re Krank, 84 B.R. at 375
("Even with insurance a Debtor may bear the unpleasant burden of attorney's fees, but attorney's
fees alone will not create prejudice sufficient to bar §362 relief").[34]

Second, and perhaps more importantly, it is possible that the retention of separate counsel
in the CP Action may not impose any significant additional costs on the Debtor at the end of the
day. The Debtor proposes that the CP Action be stayed while trial of the Adversary Proceeding
take place in this court. The Debtor's theory is that if he is successful in the Adversary
Proceeding and the Fledderman's claim is dischargeable, there will never be a need for trial of
the CP Action due to the settlement offer of the $1.2 million in insurance benefits.[35] However,
the Debtor will necessarily incur the defense costs of the Adversary Proceeding. Given the
uncertainties relating to both the scope of relief available to Mr. and Mrs. Fledderman in the

_____

[34] The Debtor also has the means to pay for separate counsel. It is difficult to believe that
Mrs. Glunk would object to or prevent the Debtor from using joint assets to fund his separate
defense in the CP Action.

[35] This assumes that the offer, which was rejected, remains open indefinitely.

-40-

Adversary Proceeding under 11 U.S.C. §523(a)(2), and the quantum of evidence necessary for

Mr. and Mrs. Fledderman to prove that the Debtor's conduct was wilful and malicious or

alternatively, that the amount of their damage claim was proximately caused by the alleged

fraudulent conduct,[36] it is not readily apparent to me that defense of the Adversary Proceeding

will be appreciably more economical for the Debtor than defense of the CP Action.  In other

words, if the Adversary Proceeding is tried before the CP Action, I expect that resolution of the

issues under 11 U.S.C. §§523(a)(2)(A) and (a)(6) will require a lengthy trial  – perhaps not quite

as long as the parties estimate for the state court trial, but certainly a trial that will be far longer

than the "mini-trial" that the Debtor suggests is necessary.

I recognize that if the Adversary Proceeding is tried first and the Debtor prevails, he will

be subject to only one trial and one set of legal expenses.  Other factors, however, outweigh this

consideration.

In evaluating whether "cause" exists for modification of the automatic stay, courts

consider circumstances other than the balancing of the respective harms to the parties.

Considerations of both comity and judicial economy may support the granting of relief from the

automatic stay to permit litigation to proceed in the nonbankruptcy forum.  See In re Quad

Systems Corp., 2001 WL 1843379, at *7 (Bankr. E.D. Pa. March 20, 2001).  In enacting

§362(d)(1), Congress recognized that "it will often be more appropriate to permit proceedings to

continue in their place of origin . . . to relieve the bankruptcy court from many duties that may be

handled elsewhere."  S. Rep. No. 989, at 50 (1978).

---

[36] See Fledderman v. Glunk, Adv. No. 05-700, slip op. at 8-9 &  n.4 (Bankr. E.D. Pa.
June 12, 2006)

In this case, considerations of comity and, perhaps, judicial economy are present. By permitting the litigation to proceed in state court, I defer to the state court which has supervised the litigation for four years and has more experience in medical malpractice litigation.[37] Deferral to the state court may also save this court (and perhaps the parties) considerable time, effort and expense. As Mr. and Mrs. Fledderman observe, if the matter is fully litigated in state court, there is a possibility that no additional proceedings will be necessary in this court or such proceedings may be of a limited scope, particularly if appropriate fact-finding is done by the state court jury. In other words, after the comprehensive trial in the more appropriate forum, there is a reasonable likelihood that all that will left for this court is the "mini-trial" on dischargeability suggested by the Debtor.[38] By comparison, if the Adversary Proceeding is conducted first, there is a likelihood of a second, substantial trial in the state court, regardless of the outcome of the dischargeability proceeding, if for no other reason but to resolve Mr. and Mrs. Fledderman's claims against the Other CP Defendants. Even if the Debtor were successful in the dischargeability proceeding in the bankruptcy court and therefore, could minimize his participation level in the follow-up state court trial against the Other CP Defendants, it would not be equitable to compel Mr. and Mrs. Fledderman to litigate many of the issues twice in two different courts.

---

[37] Further, trial of personal injury actions in the bankruptcy court may be statutorily disfavored. See 28 U.S.C. §157(b)(5) (providing for mandatory withdrawal of the reference by the district court of personal injury tort and wrongful death claims).

[38] I expect that it is in the interest of all parties to obtain answers to written interrogatories from the jury in the CP Action, insofar as that is possible under the state court procedural rules, so as to narrow the issues which must be resolved in order to determine the dischargeability of any liability that may be found in the CP Action.

My review of these considerations convinces me that the initial, comprehensive airing of

the issues should take place in state court, leaving this court ready to resolve any remaining

issues. See In re Brown, 951 F.2d 564, 570 (3d Cir. 1991).[39]

## V.  CONCLUSION

For the reasons explained above, I will deny Mr. and Mrs. Fledderman's Motion to

Dismiss the Debtor's Chapter 7 Bankruptcy Case and I will grant Mr. and Mrs. Fledderman's

Motion to Modify the Automatic Stay.  An appropriate Order will be entered.

Date: ___6/12/06___

ERIC L. FRANK
U.S. BANKRUPTCY JUDGE

---

[39] Before granting relief to permit Mr. and Mrs. Fledderman to proceed in state court and, if they are successful in the litigation, to recover from the available insurance coverage, I must consider the potential impact of such relief on other creditors.  Generally, insurance benefits which may be available to pay claims against a debtor constitute property of the estate.  In re Nutraquest, 434 F.3d 639, 647 (3d Cir. 2006).  The insurance policy in this case is not in the record.  Therefore, I cannot determine whether the insurance benefits would be exhausted by payment to Mr. and Mrs. Fledderman or whether the benefits are on a "per occurrence" basis so that benefits may be available to pay the claims of other potential plaintiffs.  If payment of the full amount of the available benefits to Mr. and Mrs. Fledderman would exhaust the policy as to all creditors, that might be a basis to limit the relief from the automatic stay to the liquidation of the claim in state court and to deny Mr. and Mrs. Fledderman, at least for the present, the right to proceed against the insurance benefits.  E.g., In re Metzner, 167 B.R. 414, 416-17 (E.D. La. 1994).  The Debtor has not raised this issue in opposition to the motion, which suggests that the Debtor believes there is little risk that other malpractice plaintiffs will appear.  Because five years has passed since Amy Fledderman's death, it is more likely than not that the Debtor would be aware of the existence of other potential claimants against his insurance coverage.  Therefore, I will not limit the relief granted based on this consideration.  Should the circumstances change before Mr. and Mrs. Fledderman actually collect the insurance proceeds (should that occur), the Debtor may seek appropriate relief in this court.

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

IN RE:   **RICHARD PAUL GLUNK**          :    **Chapter 7**

                                         :

                        **Debtor**       :    **Bky. No. 05-31656ELF**

## O R D E R

**AND NOW,** for the reasons set forth in the accompanying Opinion,

It is hereby **ORDERED** that:

1. The Motion to Dismiss the Debtor's Chapter 7 Bankruptcy Case filed by Daniel H.
Fledderman and Colleen M. Fledderman in their capacities as co-administrators of the Estate
of the Amy Fledderman is **DENIED**.

2. The Motion for Modification of the Automatic Stay filed by Daniel H. Fledderman and
Colleen M. Fledderman in their capacities as co-administrators of the Estate of the Amy
Fledderman is **GRANTED**.  Subject to further order of this court:

   a. The Movants are granted leave to proceed to resume prosecution of the action,
   Fledderman v. Glunk, No. 3619, August Term 2001 (C.P. Phila.) (the "CP Action")
   and to litigate the CP Action to a final judgment.

   b. The Movants may proceed against any available insurance benefits in order to obtain
   satisfaction or partial satisfaction of any judgment which may be entered in their favor
   in the CP Action.

c.  In all other respects, the automatic stay remains in full force and effect.

Date: ___6 | 12 | 06___

ERIC L. FRANK

U.S. BANKRUPTCY JUDGE